In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-1560

DEBORAH A. KENSETH,

*Plaintiff-Appellant*,

*v.*

DEAN HEALTH PLAN, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 08-cv-1-bbc—**Barbara B. Crabb,** *Judge.*

ARGUED DECEMBER 8, 2011—DECIDED JUNE 13, 2013

Before MANION, ROVNER and TINDER, *Circuit Judges.*

ROVNER, *Circuit Judge.* This is Deborah A. Kenseth's second appeal in a lawsuit she filed against Dean Health Plan, Inc., her health insurer, seeking a remedy for an asserted breach of fiduciary duty. The district court has twice granted summary judgment in favor of Dean, and has denied Kenseth's cross-motion for summary judgment. After the district court ruled against Kenseth for the second time, but before Kenseth briefed

this appeal, the Supreme Court issued its opinion in *Cigna Corp. v. Amara*, 131 S. Ct. 1866 (2011), clarifying the relief available for a breach of fiduciary duty in an action under the Employment Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.* ("ERISA"). Because Kenseth has a viable claim for equitable relief, we once again vacate and remand to the district court for further proceedings.

## I.

We will assume familiarity with our prior opinion in this matter, *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452 (7th Cir. 2010) ("*Kenseth I*"). We will review only those facts necessary to the disposition of the current appeal. In 1987, Deborah Kenseth underwent vertical gastric banding, a surgical procedure intended to facilitate significant weight loss in obese patients. The procedure was covered by her insurer at that time. Approximately eighteen years later, her doctor, Dr. Paul Huepenbecker, advised her to have a second operation to resolve severe acid reflux and other serious health problems that were the result of complications from the first surgery.

At the time of the second surgery, Kenseth worked for Highsmith, Inc., a company that provided group health insurance benefits to its employees through Dean Health Plan ("Dean"). Dean is the insurance services subsidiary of Dean Health Systems, Inc., a large, physician-owned and physician-governed integrated healthcare

delivery system headquartered in Madison, Wisconsin.[1] The benefits available to Highsmith employees through the Dean plan are set forth in a "Group Member Certificate and Benefit Summary" ("Certificate"). The Certificate excludes coverage for "surgical treatment or hospitalization for the treatment of morbid obesity." The Certificate also excludes "[s]ervices and/or supplies related to a non-covered benefit or service, denied referral or prior authorization, or denied admission." *Kenseth I*, 610 F.3d at 457. The Certificate directs plan participants with questions about its provisions to call Dean's customer service department. As we noted in our earlier opinion:

---

[1] A "privately held Wisconsin corporation, Dean [Health Systems, Inc.] has been a physician-owned and physician-governed organization since its inception. Ninety-five percent of Dean is owned by physician-shareholders. The remaining five percent is owned by the SSM Health Care." *See* http://www.deancare.com/about-dean/overview/ (last visited June 6, 2013). Dean bills itself as "one of the largest integrated healthcare delivery systems in the country," providing health services through a network of Dean-owned clinics and "[h]ealth insurance services through Dean Health Plan." *Id*. According to Dun & Bradstreet, at the time in question, Dean Health Systems, Inc. owned approximately 53% of Premier Medical Insurance Group, Inc., which, in turn, wholly owned Dean Health Plan. SSM Health Care owned the other 47% of Premier. Thus, the physician-shareholders who owned 95% of Dean Health Systems, Inc. also owned a majority interest in Dean Health Plan, the insurer at issue here.

> On the third page of the 2005 Certificate, under the heading "Important Information," the reader is advised to make such a call "[f]or detailed information about the Dean Health Plan." Eight pages later, at the outset of the Certificate's summary of "Specific Benefit Provisions," a text box in bold lettering states, "**If you are unsure if a service will be covered, please call the Customer Service Department at 1-608-828-1301 or 1-800-279-1301 prior to having the service performed**." No other means of ascertaining coverage is identified for services rendered by an in-plan provider.

*Kenseth I*, 610 F.3d at 457-58 (internal record cites omitted). The Certificate identifies Dean as the claims administrator and specifies that Dean has the discretion to determine eligibility for benefits and to construe the terms of the Certificate.

On November 9, 2005, Dr. Huepenbecker advised Kenseth to undergo a Roux-en-Y gastric bypass procedure in order to remedy the many problems caused by the earlier surgery. Dr. Huepenbecker worked at a Dean-owned clinic, and he scheduled Kenseth for surgery at St. Mary's Hospital in Madison, a Dean-affiliated hospital.[2] In anticipation of the surgery, Dr. Huepenbecker provided Kenseth with a standard set of pre-printed

---

[2] The hospital is part of the SSM Health Care system, which owns five percent of Dean Health Systems, Inc. and also owns a forty-seven percent stake in Dean Health Plan. *See* note 1, *supra*, and http://www.stmarysmadison.com/services/pages/careers.aspx (last visited June 6, 2013).

instructions that advised her to call her insurance company regarding the type of surgery and the scheduled date. Kenseth called Dean's customer service number and spoke with Maureen Detmer, a customer service representative. We refer the reader to our earlier opinion for the details of this call. *See Kenseth I*, 610 F.3d at 459-60. After a brief conversation, Detmer told Kenseth that Dean would cover the procedure subject to a $300 co-payment. Detmer did not ask whether the surgery was related to an earlier surgery for the treatment of morbid obesity, and Kenseth did not volunteer that information. Detmer did not warn Kenseth that she could not rely on Detmer's assessment regarding coverage. Kenseth did not review the Certificate before her surgery, although she had reviewed it in the past. She instead relied on Detmer's oral representation. Dean provided no process other than calling customer service for a plan participant to determine if a particular service or procedure would be covered.

Dr. Huepenbecker performed the surgery on December 6, 2005. On the next day, Dean decided to deny coverage for the surgery and all associated services based on the exclusion for services related to a non-covered benefit or service, namely, surgical treatment of morbid obesity. Kenseth was discharged from the hospital on December 10, 2005, but was readmitted from January 14 through January 30, 2006, for complications from the surgery, including an infection. Dean denied coverage for the second hospitalization as well, and the Dean-affiliated doctors and hospitals sent Kenseth a bill for $77,974. Kenseth pursued all available internal

appeals to Dean, asking for reconsideration of the denial, and Dean refused to change its position. Kenseth then filed suit against Dean, asserting two claims under ERISA, and one claim under Wisconsin law. Specifically, Kenseth asserted that Dean had breached its fiduciary duty by providing a Certificate that was unclear regarding coverage and misleading as to the process to follow to determine whether her surgery would be covered. She also alleged that Dean breached its fiduciary duty when it failed to provide her with a procedure through which she could obtain authoritative preapproval of her surgery. Kenseth asserted that Dean was equitably estopped from denying coverage because she relied on information provided by Dean's customer service representative that the surgery would be covered. In her state law claim, Kenseth asserted that Dean's reliance on the non-covered nature of her 1987 weight-loss surgery to deny coverage for treatment of later complications ran afoul of a Wisconsin statute regarding coverage for pre-existing conditions.

The district court granted summary judgment in favor of Dean on all of Kenseth's claims. We affirmed summary judgment as to the estoppel claim and the Wisconsin pre-existing condition claim, but we vacated and remanded for further proceedings on Kenseth's claim that Dean breached its fiduciary duty to her. *Kenseth I*, 610 F.3d at 462. We found that the facts (construed in favor of Kenseth as the party opposing summary judgment) would support a finding that Dean breached its fiduciary duty to Kenseth. First, we noted that fiduciaries have a duty to disclose material

information to beneficiaries of trusts, in this case the plan participants. *Kenseth I*, 610 F.3d at 466. That duty encompasses both an obligation not to mislead the participant of an ERISA plan, and also an affirmative obligation to communicate material facts affecting the interests of plan participants. *Kenseth I*, 610 F.3d at 466. In this instance:

> Dean not only permitted but encouraged participants to call its customer service line with questions about whether particular medical services were covered by the Dean plan. One can readily infer that Dean understood that callers like Kenseth were seeking to determine in advance whether forthcoming medical treatments would or would not be paid for by Dean, and to plan accordingly. Yet callers were not warned that they could not rely on the advice that they were given by Dean's customer service representatives and that Dean might later deny claims for services that callers had been told would be covered. Nor were callers advised of a process by which they could obtain a binding determination as to whether forthcoming services would be covered. The factfinder could conclude that Dean had a duty to make these disclosures so that participants could make appropriate decisions about their medical treatment.

*Kenseth I*, 610 F.3d at 469.

Although "mistakes in the advice given to an insured which are attributable to the negligence of the individual supplying that advice are not actionable as a breach of

fiduciary duty," a fiduciary may be liable for failing "to take reasonable steps in furtherance of an insured's right to accurate and complete information." *Kenseth I*, 610 F.3d at 470. A fiduciary could comply with this duty by providing accurate and complete written explanations of the benefits available to plan participants. 610 F.3d at 471. Nevertheless:

> because it is foreseeable if not inevitable that participants and beneficiaries will have questions for plan representatives about their benefits, our cases also recognize an obligation on the part of plan fiduciaries to anticipate such inquiries and to select and train personnel accordingly. The fiduciary satisfies that aspect of its duty of care by exercising appropriate caution in hiring, training, and supervising the types of employees (e.g., benefits staff) whose job it is to field questions from plan participants and beneficiaries about their benefits.

*Kenseth I*, 610 F.3d at 471-72. We noted that we were not called upon to decide in this case whether a plan administrator like Dean has a duty to give its insured binding determinations of coverage before a medical service is rendered. Because Dean had not denied that Kenseth could obtain a definitive decision in advance of her surgery, and because the Certificate itself encouraged plan participants with questions about coverage to call customer service prior to having the service performed, we found that availability of definitive determinations was irrelevant in this instance. Rather, the critical omission on Dean's part was its failure to com-

municate to Kenseth whether and how such determinations could be obtained. *Kenseth I*, 610 F.3d at 472-73.

We noted that any silence or ambiguity in the Certificate regarding a means of obtaining a binding coverage determination would be immaterial if the Certificate itself was clear as to coverage for Kenseth's surgery. Assessing the language of the Certificate, we concluded that, although the average reader might have understood that Kenseth's original vertical banded gastroplasty surgery was excluded from coverage, it was far from clear that the policy excluded coverage for services aimed at resolving complications from that surgery, however long ago the original procedure may have taken place. *Kenseth I*, 610 F.3d at 474. Moreover, the confusion created by the language of the Certificate was exacerbated by Dean's payments for earlier procedures that provided temporary fixes for the complications Kenseth suffered from the vertical banded gastroplasty.

The Certificate also lacked clarity on the means by which a participant may obtain an authoritative determination on coverage for a particular medical service. *Kenseth I*, 610 F.3d at 476. Although the Certificate advised participants to call customer service if they were "unsure if a service will be covered," that invitation was unaccompanied by a warning that the callers could not rely on the statements of the customer service representative, or that Dean might later deny coverage for a service that the customer service representative assured the callers would be covered. Evidence in the

record supported an inference that Dean was aware that participants often called with coverage questions and that callers were likely to rely on what customer service representatives told them. Other evidence supported an inference that Dean did not train customer service representatives to warn callers that they could not rely on the answers they were given by phone in response to coverage-related questions. Moreover, the evidence indicated that Dean did not train customer service representatives to advise callers like Kenseth how they might obtain definitive advice regarding whether particular medical services would be covered by the policy. As a fiduciary, Dean owed to "Kenseth a duty to administer the plan solely in *her* interest, not its own." *Kenseth I*, 610 F.3d at 480. We concluded:

> In this case, the factfinder could conclude that this duty included an obligation to warn Kenseth, whose call to customer service it had invited, that she could not rely on what its customer service agent told her about coverage for her forthcoming surgery and hospitalization. And, given that Dean does not dispute that there was a means by which she could have obtained coverage information that she could have relied on, the factfinder could further conclude that Dean was also obliged to tell her by what means she could obtain that information. . . . These facts, construed favorably to Kenseth, lead us to conclude that a factfinder could reasonably find that Dean breached the fiduciary obligation that it owed to Kenseth as the party charged with discretionary authority to construe the terms of her health

> plan and to grant or deny her claim for bene-
> fits—including the duty to provide her with complete
> and accurate information.

*Kenseth I*, 610 F.3d at 480.

We also found that the evidence was sufficient to survive summary judgment on the issue of whether Kenseth was harmed by this possible breach of fiduciary duty. Kenseth produced evidence that she had undergone other treatments to ameliorate her condition, and although the second surgery was the best option to permanently resolve her problems, it was not necessary that she have that procedure in December 2005. We noted that Kenseth might be able to demonstrate that she could have postponed the surgery until obtaining insurance that would cover the procedure, or could have undergone the same surgery elsewhere for a lower cost, or she could have continued to pursue other, less costly treatments. *Kenseth I*, 610 F.3d at 481.

At the time of our first opinion, the answer to the question of whether Kenseth was seeking a remedy that ERISA authorizes for a breach of fiduciary duty was far from clear. Our case law at the time suggested that Kenseth could not recover monetary damages that resembled compensatory relief. *Kenseth I*, 610 F.3d at 482. We held that the equitable relief authorized by section 1132(a)(3) included only the types of relief that were typically available in equity, such as injunctions, mandamus, and restitution. The make-whole relief that Kenseth seemed to be seeking was beyond the scope of section 1132(a)(3), according to our understanding of the

Supreme Court's holding in *Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993). But the parties had not fully briefed the issue of relief and so we remanded "for a determination as to whether Kenseth is seeking any form of equitable relief that is authorized by 29 U.S.C. § 1132(a)(3) and, if so, for further proceedings on that claim as are consistent with this opinion." *Kenseth I*, 610 F.3d at 483. We noted that if Kenseth was not able to identify a form of equitable relief appropriate to the facts of this case, she would have failed to make out a claim on which relief could be granted and her claim would have to be dismissed.

On remand, Kenseth amended her complaint to clarify the relief she was seeking. *See* R. 59. Specifically, Kenseth asked the court to order Dean to (1) cure an ambiguity in the summary plan description regarding the procedure by which a participant may obtain a binding coverage determination prior to incurring the costs of care; (2) cure an ambiguity in the summary plan description regarding when services related to non-covered services are also not covered; (3) amend the Certificate to clarify that statements made by a customer service representative are not binding on Dean; (4) train customer service representatives to inform callers that statements made by the representatives are not binding on Dean; (5) implement a procedure by which persons seeking coverage information in non-emergency situations may receive a binding determination of whether the plan covers particular procedures or treatments; (6) amend the plan to describe that a participant may receive a binding coverage deter-

mination before incurring costs for a non-emergency treatment; (7) pay Kenseth's care providers the amount Dean would have paid if the services had been covered as represented to Kenseth on the phone; (8) enjoin subsidiary or parent corporations of Dean from collecting fees for services rendered to Kenseth; (9) make whole all unaffiliated entities to whom Kenseth owed a debt due to the surgery that Dean represented would be covered; (10) pay a surcharge to Kenseth equal to the amount she owes to others directly due to Dean's breach of fiduciary duty; (11) pay Kenseth's attorneys' fees and costs for this action; (12) honor its policy of covering costs incurred when a customer service representative mistakenly represents that a service will be covered; and (13) honor its policy of covering medical expenses when Dean mistakenly misleads a participant by failing to have a proper procedure in place by which the participant could obtain a binding coverage determination before costs are incurred. R. 59.

The parties filed cross-motions for summary judgment on Kenseth's remaining claim for breach of fiduciary duty. The district court declined to decide whether Kenseth had demonstrated as a matter of law that Dean breached its fiduciary duty to her because the court determined that it could not grant Kenseth the relief she sought even if she proved a breach of fiduciary duty. *Kenseth v. Dean Health Plan, Inc.*, 784 F. Supp. 2d 1081, 1083-84 (W.D. Wis. 2011) ("*Kenseth II*"). The court found that Kenseth's request that Dean hold her harmless for the cost of the surgery was really a plea for compensatory damages that are not available as equitable relief

under section 1132(a)(3). The court also concluded that it could not grant any of Kenseth's requests to change the plan, the Certificate, or Dean's policies and practices because Kenseth was no longer a participant in Dean's plan. 784 F. Supp. 2d at 1092-93. Finally, the court determined that Kenseth was not entitled to an award of attorneys' fees because she had achieved only very limited success in the course of the lawsuit, and the defendant's legal position had been substantially justified. 784 F. Supp. 2d at 1094-96. Kenseth appeals from the judgment in favor of Dean.

## II.

After the district court granted judgment in favor of Dean and before the case was briefed on appeal, the Supreme Court decided *Cigna Corp. v. Amara*, 131 S. Ct. 1866 (2011). On appeal, Kenseth contends that *Cigna* requires that we reverse and remand for further proceedings. Under *Cigna*, Kenseth argues, equitable relief may include a money payment, including compensation for a loss resulting from a breach of fiduciary duty. Kenseth also objects to the district court's conclusion that, even if it was possible to place Kenseth back in the position she was in before the breach of fiduciary duty, Kenseth would have incurred the costs of surgery anyway because she had no other options given the nature of her health problems. The court erred on the facts and the law, Kenseth contends, and the record raises at least a triable question of fact on her other options if she had been told in a timely manner that the surgery would not

be covered by her insurance. Although the district court declined to decide the issue, Kenseth also maintains that she is entitled to partial summary judgment on her claim that Dean breached its fiduciary duty to her in the manner we set forth in our original opinion. Moreover, Kenseth claims that she has adequately demonstrated her standing to seek injunctions requiring Dean to change its practices and plan even though she was no longer a plan participant at the time she moved for summary judgment. She asserts that she was a plan participant at the time of the injury, that she had a different insurance plan for a time, and that she is now again a Dean plan participant. That should be sufficient, she contends. Finally, she asks that we order the district court to reconsider her entitlement to attorneys' fees.

For its part, Dean contends that Kenseth has failed to identify any form of equitable relief available to her under the facts of the case. As a threshold matter, Dean claims that Kenseth has not shown that she is a "participant" entitled to bring a claim under section 1132(a)(3). Moreover, Dean claims that Kenseth lacks standing to pursue prospective injunctive relief under that same provision. Dean again attacks Kenseth's pursuit of monetary damages as unavailable as equitable relief under section 1132(a)(3). Dean contests Kenseth's pursuit of equitable relief against Dean affiliates that are not defendants in the lawsuit, and also challenges Kenseth's pursuit of attorneys' fees (both as equitable relief and as an exercise of the district court's discretion). Dean asks us to affirm the district court's conclusion that Kenseth failed to demonstrate that she could have averted the

harm if she had been given accurate information by the customer service representative. Finally, Dean contends that Kenseth is not entitled to summary judgment on the liability aspect of her claim for breach of fiduciary duty.

**A.**

We begin with an overview of *Cigna*, a case that significantly altered the understanding of equitable relief available under section 1132(a)(3). In 1998, Cigna changed its basic pension plan for the company's employees. The original plan provided a defined benefit in the form of an annuity calculated on the basis of pre-retirement salary and length of service; the new plan provided most retiring employees with a lump sum cash balance calculated by other means that turned out to be far less favorable. For employees who had already earned some benefits under the old plan, the new plan converted those benefits into an opening amount in the employee's new cash balance account. The employees challenged the adoption of the new plan, claiming that Cigna failed to give them proper notice of the changes. The district court agreed that Cigna violated its disclosure obligations under ERISA, finding that the company's initial descriptions of the new plan were significantly incomplete and misleading. The court also concluded that the employees were likely harmed by the notice violations. The district court reformed the new plan and ordered Cigna to pay benefits accordingly, citing section 1132(a)(1)(B) as the source of its authority. *Cigna*, 131 S. Ct. at 1870-72.

The Supreme Court granted *certiorari* to consider whether a showing of "likely harm" is sufficient to entitle plan participants to recover benefits based on faulty disclosures. *Cigna*, 131 S. Ct. at 1871, 1876. Before reaching that issue, however, the Court determined that section 1132(a)(3), rather than section 1132(a)(1)(B), provided authority for the forms of equitable relief that the district court granted. *Cigna*, 131 S. Ct. at 1871, 1876-78. The Court noted that section 1132(a)(1)(B) addressed enforcing the terms of a plan, not changing them. 131 S. Ct. at 1876-77. Moreover, the plan summaries could not be enforced as if they contained the terms of the plan itself. 131 S. Ct. at 1877. The Court distinguished between the plan itself and the summaries which consist of information about the plan. *Id*. Likewise, the statute carefully distinguished the roles of the plan sponsor (usually the employer) that created the basic terms of the plan, and the plan administrator:

> The plan's sponsor ( e.g., the employer), like a trust's settlor, creates the basic terms and conditions of the plan, executes a written instrument containing those terms and conditions, and provides in that instrument "a procedure" for making amendments. . . . The plan's administrator, a trustee-like fiduciary, manages the plan, follows its terms in doing so, and provides participants with the summary documents that describe the plan (and modifications) in readily understandable form. . . . Here, the District Court found that the same entity, CIGNA, filled both roles. . . . But that is not always the case. Regardless, we have found that ERISA carefully distin-

guishes these roles. . . . And we have no reason to believe that the statute intends to mix the responsibilities by giving the administrator the power to set plan terms indirectly by including them in the summary plan descriptions.

*Cigna*, 131 S. Ct. at 1877. The Court thus concluded that summary documents provided by the plan administrator could not themselves constitute the terms of the plan for the purposes of section 1132(a)(1)(B), and that a court could not find authority in that section to reform a plan as written. 131 S. Ct. at 1878.

Section 1132(a)(3), on the other hand, "allows a "participant, beneficiary, or fiduciary 'to obtain other *appropriate equitable relief*' to redress violations of . . . parts of ERISA 'or the terms of the plan'" *Cigna*, 131 S. Ct. at 1878 (emphasis in original). The district court had been reluctant to grant relief under section 1132(a)(3) because of perceived limitations under Supreme Court precedent in the types of relief available under that section. Anticipating that the available relief would be an issue on remand, the Court therefore addressed what types of equitable relief are available under section 1132(a)(3). 131 S. Ct. at 1878. In *Mertens*, the Court had interpreted the term "appropriate equitable relief" as categories of relief that, prior to the merger of law and equity, were *typically* available in equity. *Cigna*, 131 S. Ct. at 1878; *Mertens*, 508 U.S. at 256. A claim that sought compensatory damages against a non-fiduciary, as did the claim in *Mertens*, was traditionally legal, not equitable, in nature. *Cigna*, 131 S. Ct. at 1878. Similarly, in *Great-West*

*Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002), the Court considered a claim brought by a plan fiduciary seeking reimbursement of money that a plan beneficiary received from a tort defendant. The Court noted that the money in question was not the particular money paid by the tort defendant, making the claim one for legal rather than equitable relief. Such a claim could not be brought under section 1132(a)(3). *Great-West*, 534 U.S. at 207-16; *Cigna*, 131 S. Ct. at 1878-79.

The claim in *Cigna*, the Court noted, differed from both of these cases. This was a suit by a beneficiary against a plan fiduciary (typically treated in ERISA as a trustee) regarding the terms of the plan (typically treated under ERISA as a trust). *Cigna*, 131 S. Ct. at 1879. Prior to the merger of law and equity, such a suit could be brought only in a court of equity. The traditionally available equitable remedies included, among other things, positive and negative injunctions, mandamus and restitution. *Cigna*, 131 S. Ct. at 1879. Courts in equity specially tailored remedies to fit the nature of the right they sought to protect because " '[e]quity suffers not a right to be without a remedy.' " *Cigna*, 131 S. Ct. at 1879 (quoting R. Francis, Maxims of Equity 29 (1st Am. ed. 1823)).

The Court found that the relief entered by the district court in *Cigna* resembled traditional equitable remedies. First, the district court ordered reformation of the terms of the plan in order to remedy the false and misleading information that Cigna provided. The Court noted that the power to reform contracts (as opposed to the power to enforce contracts as written) was traditionally

reserved to courts of equity as a means to prevent fraud or correct mistakes. *Cigna*, 131 S. Ct. at 1879. Second, the district court ordered that Cigna could not deprive the employees of benefits they had already accrued, a remedy resembling estoppel. *Cigna*, 131 S. Ct. at 1880. The Court noted that "[e]quitable estoppel 'operates to place the person entitled to its benefit in the same position he would have been in had the representations been true.'" *Cigna*, 131 S. Ct. at 1880 (quoting J. Eaton, Handbook of Equity Jurisprudence § 62, p. 176 (1901)).

Third, and perhaps most relevant to the circumstances of Kenseth's case, the Court approved of the district court's order to the plan administrator to pay already-retired beneficiaries the money owed to them under the plan *as reformed*:

> But the fact that this relief takes the form of a money payment does not remove it from the category of traditionally equitable relief. Equity courts possessed the power to provide relief in the form of monetary "compensation" for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment. Indeed, prior to the merger of law and equity this kind of monetary remedy against a trustee, sometimes called a "surcharge," was "exclusively equitable."
>
> * * *
>
> The surcharge remedy extended to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary. Thus, insofar as an award of make-whole relief is

> concerned, the fact that the defendant in this case, unlike the defendant in *Mertens*, is analogous to a trustee makes a critical difference.

*Cigna*, 131 S. Ct. at 1880 (citations and parentheticals omitted). The Court thus clarified that equitable relief may come in the form of money damages when the defendant is a trustee in breach of a fiduciary duty.

Having elucidated the relief available, the Court turned to the appropriate legal standard for determining whether an ERISA plaintiff has been injured. The Court first noted that "any requirement of harm must come from the law of equity." *Cigna*, 131 S. Ct. at 1881. There is no need to demonstrate detrimental reliance before a remedy may be decreed unless the specific remedy imposes such a requirement. *Id*. For example, when courts of equity used the remedy of estoppel, they traditionally required a showing of detrimental reliance, a demonstration that the defendant's statement influenced the conduct of the plaintiff, resulting in prejudice. Thus, when a court imposes a remedy of estoppel, the plaintiff must demonstrate detrimental reliance. *Id*.

The Court hastened to add that not all equitable remedies require a showing of detrimental reliance. For example, an equity court might reform a contract to reflect the mutual understanding of the contracting parties where a fraudulent misrepresentation or omission materially affected the substance of the contract, even if the plaintiff was negligent in not realizing the mistake, so long as that negligence did not fall below a standard of reasonable prudence. *Cigna*, 131 S. Ct. at 1881.

Nor was a showing of detrimental reliance necessary to justify the remedy of surcharge. Courts of equity "simply ordered a trust or beneficiary made whole following a trustee's breach of trust. In such instances equity courts would 'mold the relief to protect the rights of the beneficiary according to the situation involved.'" *Cigna*, 131 S. Ct. at 1881 (quoting G. Bogert & G. Bogert, Trusts and Trustees § 861, at p. 4 (rev. 2d ed. 1995) (hereafter "Bogert")).

An ERISA fiduciary, under the Court's reasoning, could be surcharged under section 1132(a)(3) only upon a showing of actual harm, proved by a preponderance of the evidence. That actual harm might consist of detrimental reliance, "but it might also come from the loss of a right protected by ERISA or its trust-law antecedents." *Cigna*, 131 S. Ct. at 1881. As is also the case with Kenseth, in *Cigna*, the breach of fiduciary duty involved an information-related transgression by the defendant. In particular, Cigna provided misleading summary plan documents when announcing the changes to the plan. The Court found that it was not necessary for a plaintiff to demonstrate that she relied on those documents or that she even saw the flawed documents. An employee may have assumed that fellow employees or informal workplace discussions would alert them to harmful changes in the plan. The Court then summarized the required proof of harm:

> We believe that, to obtain relief by surcharge for violations of §§ 102(a) and 104(b), a plan participant or beneficiary must show that the violation injured

him or her. But to do so, *he or she need only show harm and causation*. Although it is not always necessary to meet the more rigorous standard implicit in the words "detrimental reliance," actual harm must be shown. . . . And we conclude that the standard of prejudice must be borrowed from equitable principles, as modified by the obligations and injuries identified by ERISA itself. Information-related circumstances, violations, and injuries are potentially too various in nature to insist that harm must always meet that more vigorous "detrimental harm" standard when equity imposed no such strict requirement.

*Cigna*, 131 S. Ct. at 1881-82 (emphasis added).[3] Noting that "the relevant standard of harm will depend upon the equitable theory by which the District Court provides relief," the Court left "it to the District Court to conduct that analysis in the first instance." 131 S. Ct. at 1871.

**B.**

So the relief available for a breach of fiduciary duty under section 1132(a)(3) is broader than we have previously held, and broader than the district court could have anticipated before the Supreme Court's decision in *Cigna*. Monetary compensation is not automatically

---

[3] Sections 102(a) and 104(b) correspond to 29 U.S.C. §§ 1022(a) and 1024(b).

considered "legal" rather than "equitable." The identity of the defendant as a fiduciary, the breach of a fiduciary duty, and the nature of the harm are important in characterizing the relief. *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 450 (5th Cir. 2013) ("The Supreme Court recently stated an expansion of the kind of relief available under § 503(a)(3) when the plaintiff is suing a plan fiduciary and the relief sought makes the plaintiff whole for losses caused by the defendant's breach of fiduciary duty."). *See also McCravy v. Metropolitan Life Ins. Co.*, 690 F.3d 176, 181 (4th Cir. 2012) (under *Cigna*, "remedies traditionally available in courts of equity, expressly including estoppel and surcharge, are indeed available to plaintiffs suing fiduciaries under Section 1132(a)(3)").

Kenseth, of course, is suing the plan fiduciary and she is requesting relief to make her whole for Dean's breach of fiduciary duty. Although there are some factual differences, there are also a number of relevant parallels between Kenseth's case and Gearlds' case. Gearlds agreed to take early retirement because a plan administrator told him orally and in writing that he would continue to receive medical benefits. Gearlds then waived medical benefits available under his wife's retirement plan in reliance on the assurances he had received from the plan administrator. Several years later, the plan administrator notified him that it was discontinuing his medical benefits because he had not been entitled to the benefits in the first place. The plan administrator had been under the mistaken impression that Gearlds was receiving long term disability benefits

at the time he took early retirement when in fact those benefits had ceased three years earlier. Under the plan, Gearlds was therefore ineligible for medical benefits available to early retirees. Gearlds asserted a claim under section 1132(a)(3) for breach of fiduciary duty and equitable estoppel, seeking as damages his past and future medical expenses, among other things. 709 F.3d at 449-50. The district court dismissed the complaint for failure to state a claim because Gearlds sought only compensatory money damages, which were not available as equitable relief under section 1132(a)(3). 709 F.3d at 450.

On appeal, the Fifth Circuit re-evaluated the claims under the Supreme Court's decision in *Cigna*, and concluded that simply characterizing money damages as a legal remedy was no longer the end of the inquiry. 709 F.3d at 451. Surcharge, the court held, was an equitable form of money damages that might be available for a breach of fiduciary duty. 709 F.3d at 451-52. This was true even though Gearlds had not specifically included surcharge in his prayer for relief. Instead, he had asked to be made whole in the form of compensation for lost benefits, and requested any other relief "equitable or otherwise," to which he might be entitled. After *Cigna*, such a request stated a viable claim for relief, according to the Fifth Circuit. 709 F.3d at 452-53. The court therefore remanded for the district court to determine whether the plan administrator breached its fiduciary duty and whether the breach warranted the equitable relief of surcharge. *Gearlds*, 709 F.3d at 453.

Like Gearlds, Kenseth took action in reliance on an assurance that she would be covered by a plan benefit. As was the case in *Gearlds*, Dean, the plan fiduciary, mistakenly assumed facts that would have entitled Kenseth to benefits as a plan participant. The plan administrators in both Gearlds' and Kenseth's cases later determined that the plan participants were not actually entitled to the benefits under the terms of the plan. Like Gearlds, Kenseth pled a breach of fiduciary duty by the plan administrator in misleading her, and like Gearlds she now seeks to be made whole with money damages.

In remanding Gearlds' claim, the Fifth Circuit relied in part on the Fourth Circuit's decision in *McCravy*. McCravy purchased life insurance for her daughter through her employer-sponsored accidental death and dismemberment plan. 690 F.3d at 178. The plan allowed employees to purchase this coverage for eligible dependent children. Under the plan, children were eligible for coverage so long as they were unmarried, dependent on the insured employee, and either under age nineteen if not enrolled in school, or under age twenty-four if they were enrolled full-time in school. McCravy elected the coverage for her eighteen-year-old daughter, and continued to pay premiums until her daughter died at the age of 25. When McCravy filed a claim, the plan administrator refused to pay because McCravy's daughter was not eligible under the terms of the plan. The plan instead offered to return the premiums. McCravy contended that the plan's actions constituted a breach of fiduciary duty because the plan continued to accept premiums, leaving her under the impression that

her daughter was covered. Because she believed her daughter was insured, McCravy did not purchase alternate insurance. She asserted claims for breach of fiduciary duty and estoppel. The district court, ruling prior to the Supreme Court's decision in *Cigna*, held that McCravy was limited to a return of premiums under section 1132(a)(3). *McCravy*, 690 F.3d at 178-79.

On appeal, the Fourth Circuit agreed with McCravy that *Cigna* expanded the relief and remedies available to plaintiffs asserting breaches of fiduciary duty under section 1132(a)(3). In particular, the court found that McCravy stated a viable equitable claim for make-whole relief in the amount of the life insurance proceeds lost because of the trustee's breach of fiduciary duty. *McCravy*, 690 F.3d at 181. She was not limited to seeking a return of premiums, the court determined, because under *Cigna*, courts have the power to provide equitable relief in the form of monetary compensation for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment. 690 F.3d at 181-82. The court thus agreed with McCravy that, as the beneficiary of a trust, she could rightfully seek to surcharge the trustee insurer in the amount of life insurance proceeds lost because of that trustee's breach of fiduciary duty. 690 F.3d at 181. The court noted that limiting damages to the return of premiums created a "perverse incentive" for fiduciaries "to wrongfully accept premiums, even if they had no idea as to whether coverage existed—or even if they affirmatively knew that it did not." *McCravy*, 690 F.3d at 183. After all, the greatest risk the fiduciary faced in that scenario would be the return of ill-gotten

gains, a risk that would materialize only if a plan participant made a claim for benefits. In instances where plan participants paid premiums but never filed claims, the fiduciary would reap a risk-free windfall from employees who had paid for non-existent benefits. According to the court, McCravy could also pursue a claim for equitable estoppel to prevent the insurer from denying her the right to convert her daughter's coverage to an individual policy. 690 F.3d at 182. The court reversed and remanded for the district court to determine in the first instance whether McCravy could succeed in proving that the plan administrator breached its fiduciary duty to her and whether surcharge or equitable estoppel were appropriate remedies in the circumstances presented. 690 F.3d at 181-82.

Despite some factual differences, *McCravy* also provides parallels to Kenseth's situation. The plan administrator in *McCravy*, in continuing to accept premiums, lulled McCravy into believing that her daughter was covered under the policy. Dean, by encouraging plan participants to call for coverage information before undergoing procedures, by telling Kenseth that Dean would pay for the procedure, and by not alerting Kenseth that she could not rely on the advice she received, lulled Kenseth into believing that Dean would cover the cost of the procedure. McCravy did not obtain alternate coverage because she believed she was covered. Kenseth did not explore alternate coverage, treatments or options because she had been led to

believe that Dean would pay for this treatment.[4]

---

[4] The risk to Dean of giving incorrect advice was even less than the risk to the plan in *McCravy* because Dean did not even face the prospect of returning premiums. Although Dean Health Systems, Inc. and Dean Health Plan share the same ownership (see note 1, *supra*), Kenseth has not attempted to demonstrate that her Dean-affiliated providers stood to gain from Dean's possible breach of fiduciary duty. According to the district court, Kenseth's health providers would collect approximately $35,000 if Dean approved the claim, but could bill Kenseth for more than twice that amount if Dean denied the claim. *See Kenseth II*, 784 F. Supp. 2d at 1084. The hospital where Kenseth had the surgery was owned by SMS Health Care, which owned five percent of Dean Health Systems, Inc. and a forty-seven percent interest in Dean. *See* notes 1 & 2, *supra*. As with *McCravy*, this scenario potentially created "perverse incentive[s]" for Dean. In general, fiduciaries may not direct profits from a breach to favored or related third parties any more than they may pocket the profits themselves. *Mosser v. Darrow*, 341 U.S. 267, 272 (1951) ("We think that which the trustee had no right to do he had no right to authorize, and that the transactions were as forbidden for benefit of others as they would have been on behalf of the trustee himself."); Bogert, § 543(V) (trustee may be compelled to pay into trust fund amount equal to profits made by agents in order to deter trustee from authorizing agents to engage in disloyal actions, even where trustee did not profit by the agents' actions); *Amara v. Cigna Corp.*, 2012 WL 6649587, *8 (D. Conn. Dec. 20, 2012) (trustees may be surcharged where they have not personally profited from the breach, in situations where they negligently or knowingly permit third parties to benefit from the

(continued...)

Thus, under *Cigna*, Kenseth may seek make-whole money damages as an equitable remedy under section 1132(a)(3) if she can in fact demonstrate that Dean breached its fiduciary duty to her and that the breach caused her damages. *Cigna*, 131 S. Ct. at 1881-82; *Gearlds*, 709 F.3d at 450-52; *McCravy*, 690 F.3d at 181-82. We determined in our first opinion that the Certificate was ambiguous on the question of whether there was coverage for the corrective procedure Kenseth underwent. *Kenseth I*, 610 F.3d at 474-76. The Certificate was also unclear in that it failed to identify a means by which a participant may obtain an authoritative determination on a coverage question, even though Dean conceded that such a process existed. *Kenseth I*, 610 F.3d at 476. The Certificate created further uncertainty by inviting participants to call customer service with coverage questions but not warning them that they could not rely on any advice they received. *Kenseth I*, 610 F.3d at 478. The plan was thus ambiguous in at least three important respects and, as in *Gearlds*, Kenseth may thus bring

---

[4] (...continued)
trust property) (citing *Morrissey v. Curran*, 650 F.2d 1267, 1282 (2d Cir. 1981)). *See also Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008) (when an insurance company both administers a plan and pays benefits out of its own pocket, this dual role creates a conflict of interest that a reviewing court should consider as a factor in determining whether a plan administrator abused its discretion in denying benefits under section 1132(a)(1)(B), depending on the circumstances of the particular case).

a claim for make-whole damages against the plan fiduciary. This is true even if the plan's language *unambiguously* supports the fiduciary's decision to deny coverage. *See Koehler v. Aetna Health, Inc.*, 683 F.3d 182, 189 (5th Cir. 2012) (even if the plan's language unambiguously supports the administrator's decision, a beneficiary may still seek to hold the administrator to conflicting terms in the plan summary through a breach of fiduciary claim under section 1132(a)(3)); *CGI Techs. & Solutions Inc. v. Rose*, 683 F.3d 1113, 1121 (9th Cir. 2012) (under *Cigna*, a district court, sitting as a court of equity in a section 1132(a)(3) action, need not honor the express terms of an ERISA plan where traditional notions of equitable relief so require); *US Airways, Inc. v. McCutchen*, 663 F.3d 671, 678 (3d Cir. 2011), *cert. granted*, 133 S. Ct. 36 (2012) ("the importance of the written benefit plan is not inviolable, but is subject—based upon equitable doctrines and principles—to modification and, indeed, even equitable reformation under § [1132](a)(3)"). Indeed, in *Cigna* itself, the Court approved of the district court's decision to reform the terms of the plan and then order the administrator to pay benefits according to the reformed plan.

The district court, without the benefit of *Cigna*, remarked that "[m]any might be surprised to learn that [the] defendant has no legal duty to make things right" after "lulling [Kenseth] into believing that she had coverage for an expensive operation, only to reverse course after the procedure was performed, leaving her with a stack of medical bills." *Kenseth II*, 784 F. Supp. 2d at 1084. We can now comfortably say that if Kenseth is able

to demonstrate a breach of fiduciary duty as we set
forth in our first opinion, and if she can show that the
breach caused her damages, she may seek an appropriate
equitable remedy including make-whole relief in the
form of money damages. But as was the case in *Cigna*,
*Gearlds*, and *McCravy*, we leave it to the district court in
the first instance to fashion the appropriate relief, and
to determine whether surcharge or some other equitable
remedy is appropriate under the particular circum-
stances presented here.

## C.

The district court concluded that even if Kenseth
could demonstrate a breach of fiduciary duty by Dean,
she could not prove that Dean's actions harmed her. In
reaching this conclusion, the court found that the breach
was Dean's failure to give Kenseth correct information
regarding the lack of coverage for the procedure. The
proper make-whole remedy, the court reasoned, would
be to place Kenseth back in the position she would have
been in if Dean had provided correct information. The
appropriate comparison, the court determined, was to
assess Kenseth's options as if she were still ill but had
the correct information that the plan would not pay for
the procedure. The court found that Kenseth had failed
to demonstrate that she could have elected to forego
the surgery. The court remarked that Kenseth had not
presented evidence that she could have waited until
she obtained alternative insurance coverage or that she
could have obtained the procedure elsewhere for less.

Because Kenseth did not set forth any viable alternatives to the surgery, the court concluded that she would have incurred the cost of the surgery whether or not Dean had provided the correct information regarding coverage. The court thus concluded that any breach by Dean did not harm Kenseth. *Kenseth II*, 784 F. Supp. 2d at 1091.

But Kenseth had, in fact, produced evidence that she would *not* have proceeded with the surgery had she known that Dean would not pay for it. She also produced evidence that, although surgery was the best option to permanently correct her problems, other viable alternatives were available. Specifically, Kenseth testified that if the customer service representative had told her the procedure would not have been covered, she would have considered other alternatives, checked to see if her husband's policy would cover the surgery, and returned to Dr. Huepenbecker to explore other options. R. 21, at 32, 34.[5] In short, she testified that she

---

[5] The policy available through the employer of Kenseth's husband at the relevant time did exclude coverage for surgical treatment of morbid obesity, and also excluded "expenses for treatment of complications of non-covered procedures or services." R. 34-3, at 62-63. This language creates some of the same ambiguities that are present in Dean's plan. For example, Kenseth's original surgery for morbid obesity **was** covered by her insurer when she underwent that procedure. This policy language could be read to pay for complications resulting from services that, although no longer covered,

(continued...)

"probably wouldn't have had the surgery if it wasn't covered." R. 21, at 34. Dr. Huepenbecker averred that, although the surgery he performed was the most effective treatment for Kenseth's conditions, "she could have continued the treatments she had been receiving and had the surgery at a later date." R. 38, at 3. Indeed, Dean effectively conceded the point when it indicated that it had "[n]o dispute" in response to Kenseth's Proposed Finding of Fact stating:

> The surgery performed by Dr. Huepenbecker on December 6, 2005, was the most effective treatment for Ms. Kenseth's conditions. However, she could have continued the treatments she had been receiving and had surgery at a later date.

R. 42, at 21. In our first opinion, we also concluded that Kenseth had "presented evidence that would permit the factfinder to conclude that she was harmed by Dean's alleged breach of fiduciary duty." *Kenseth I*, 610 F.3d at 481. Nothing in the record on appeal this time convinces us that our earlier conclusion was flawed.

Nevertheless, Dean now contends that Kenseth must come forward with more evidence of a specific alterna-

---

[5] (...continued)

were covered at the time they were received. Moreover, an average plan reader might not understand that the word "complications" could include issues that arise nearly twenty years after the original procedure. Finally, we do not know how the plan administrator for this other plan would have applied this language to the particular circumstances of Kenseth's case.

tive, that she must produce some other insurance policy that would have been available to her, and that her husband's policy contained the same exclusions as the Dean policy. We disagree. This is a classic dispute of fact and Kenseth has produced sufficient evidence that she could have avoided some or all of the expense of surgery at that time. Her Dean-affiliated doctor agreed that she could have continued other, less-effective treatments for at least some period of time, treatments that Dean had been covering without objection up to that point. Dr. Abigail Christiansen, the physician who referred Kenseth to Dr. Huepenbecker, also believed that there was a viable, non-surgical option, as did Dr. Thomas Chua, another doctor Kenseth consulted prior to deciding on surgery with Dr. Huepenbecker.[6] R. 21. At the very least, Kenseth could have negotiated a lower cost for the procedure either with the Dean-affiliated hospital or some other facility. As the district court noted, because of agreements that Dean had in place with its providers, the insurer would have paid Kenseth's Dean-affiliated providers approximately $35,000, less than half of the $77,974 that those providers billed Kenseth for the procedure. *Kenseth II*, 784 F. Supp. 2d at 1084. Undoubtedly, Kenseth could have negotiated a price between $35,000 and $77,974 with a rational hospital, given that she could have foregone (or at least delayed) the surgery at that time.

---

[6] According to Dr. Christiansen's notes, Dr. Chua recommended continued dilation and steroid injections instead of surgical revision of the affected area.

Dean wishes to place on Kenseth an additional burden of proving that other treatments would have been effective until she obtained alternate insurance coverage for surgery. But as we just noted, Kenseth has already created a genuine issue of material fact on this issue with her own testimony and with the opinions of three different doctors (Drs. Huepenbecker, Christiansen, and Chua) that she could have continued less aggressive treatments. Of course, it is difficult to assess in hindsight how Kenseth might have responded to these less drastic and less expensive treatments, and whether she would have been able to forego surgery until she obtained alternate insurance or negotiated a price for the procedure that she could afford without insurance. Kenseth did not explore other options because Dean gave her every reason to believe that it would cover the option that her Dean-affiliated doctor considered the best treatment. She did not seek alternate insurance, attempt to find a hospital that might perform the surgery for a lower cost, or seek out other doctors or opinions. Instead, she took an irreversible course of action in reliance on the approval given to her by Dean's customer service representative, a reliance that Dean invited with its directive in the Certificate for participants to call with questions regarding coverage. The surgery could not be undone, the cost un-incurred. Kenseth could not seek insurance retroactively or negotiate with other providers for services that had already been performed. Dean's actions had the singular effect of making it impossible to place Kenseth back in the literal position she would have been in if

the breach had not occurred, and also rendered very difficult the proof of viable alternatives. *See In re Beck Ind., Inc.*, 605 F.2d 624, 636 (2d Cir. 1979) ("[c]ourts do not take kindly to arguments by fiduciaries who have breached their obligations that, if they had not done this, everything would have been the same."). Dean, notably, has presented no evidence that the surgery was Kenseth's only option.

In any case, Kenseth testified that she probably would not have undergone the procedure if Dean had denied coverage in a timely manner, and her doctor has averred that viable alternatives were available. Moreover, Kenseth lost the opportunity to negotiate a lower price with either the Dean providers or some other provider, an opportunity that likely would have been fruitful given the large gap between what Dean contracted to pay its providers and what those providers charged Kenseth as an uninsured patient. Kenseth's testimony, her doctors' opinions that alternatives were available, and the simple economics of the situation are enough to create a genuine issue of fact regarding whether Kenseth could have avoided some or all of the costs she incurred. We therefore vacate the district court's finding to the contrary. We leave it to the district court on remand to determine in the first instance the amount of any loss caused by Dean.

## D.

We turn to whether Kenseth is entitled to judgment as a matter of law on the liability aspect of her claim for

breach of fiduciary duty. The district court declined to reach this issue after it determined that Kenseth could not prove that any breach actually harmed her. As we have just determined, Kenseth produced sufficient evidence that she was harmed and so the question of whether Dean's actions constituted a breach of fiduciary duty must be answered. In our first opinion, we set forth the facts that would constitute a breach of fiduciary duty, and noted that most, if not all, of those facts were undisputed. But we declined to reach the issue because Kenseth herself had not filed a cross-motion for summary judgment and Dean was therefore not on notice that we were contemplating entering judgment on this issue. *Kenseth I*, 610 F.3d at 483. On remand, Kenseth did move for summary judgment and so Dean was on notice that the district court and the court of appeals might address the issue. As we noted, the district court declined to address whether Kenseth was entitled to partial summary judgment, but we may do so in the first instance. *See* 28 U.S.C. § 2106; *Turner v. J.V.D.B. & Assocs., Inc.*, 330 F.3d 991, 998 (7th Cir. 2003) (federal courts of appeals have the authority under 28 U.S.C. § 2106 to direct entry of summary judgment when so doing would be just under the circumstances); *Trejo v. Shoben*, 319 F.3d 878, 886 (7th Cir. 2003) (noting that we have the discretion to affirm a district court's decision to dismiss if subsequent discovery reveals that the defendant would have been entitled to summary judgment on the claim that was dismissed, and the plaintiff-appellant fails to identify what additional favorable facts might possibly have been revealed through additional dis-

covery if the claim had not been dismissed); *Swaback v. American Info. Techs. Corp.*, 103 F.3d 535, 544 (7th Cir. 1996) (in instances in which the facts and law establish that the appellant is entitled to judgment as a matter of law, we are free to direct the district court to enter judgment in appellant's favor). But we do not commonly take this step, and see no reason at this time to separate the question of breach from the issues of causation and relief that the district court must still decide. Nevertheless, some analysis is required in light of a new argument that Dean raises in this appeal and because of Dean's continued challenges to issues that we resolved in the first appeal.

The framework we set forth in our first opinion, where we extensively addressed the issue of breach of fiduciary duty, still applies. We framed both the duties that Dean owed Kenseth as a fiduciary and the actions (or inaction) taken by Dean that would constitute a breach of those duties. *Kenseth I*, 610 F.3d at 464-81. In *Kenseth I*, we noted that a fiduciary is obliged to disclose material information, and has a duty not to mislead a plan participant. 610 F.3d at 466. We have previously held that an insurer has an affirmative obligation to provide accurate and complete information when a beneficiary inquires about her insurance coverage. *Kenseth I*, 610 F.3d at 468; *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 590 (7th Cir. 2000). At the same time, a fiduciary will not be held liable for negligent misrepresentations made by an agent of the plan to a plan participant so long as the plan documents themselves are clear and the fiduciary

has taken reasonable steps to avoid such errors. *Kenseth I*, 610 F.3d at 470.

"The most important way in which the fiduciary complies with its duty of care is to provide accurate and complete written explanations of the benefits available to plan participants and beneficiaries." *Kenseth I*, 610 F.3d at 471. Even with reasonably well-written documents, though, participants will inevitably have questions, and so our cases acknowledge an obligation for plan fiduciaries to anticipate inquiries and train staff accordingly. *Id*. If the plan documents are clear and the fiduciary has appropriately trained staff to field inquiries, a fiduciary will not be held liable if a ministerial, non-fiduciary agent has given incomplete or mistaken advice to an insured. *Kenseth I*, 610 F.3d at 472. But if the documents are ambiguous or incomplete on a recurring topic, a fiduciary may be liable for mistakes that representatives make in answering questions on that subject.

After reviewing the plan documents, we concluded that the 2005 Certificate was ambiguous on the issue of coverage for Kenseth's surgery. The average reader may well have understood that the plan would not pay for surgical treatment of morbid obesity for a person seeking that surgery in 2005. But the general exclusion for "services and/or supplies related to a non-covered benefit or service, denied referral or prior authorization, or denied admission" was far from clear. We set forth the many ambiguities contained in this provision in our earlier opinion. *See Kenseth I*, 610 F.3d at 474-75. For

example, at the time Kenseth had the original pro-
cedure, it was in fact covered by her health insurer.
The average reader would be unlikely to classify a proce-
dure as a "non-covered service" if it had in fact been
covered. Nor would that reader comprehend that the
treatment of complications occurring some eighteen
years after the original surgery entailed services "related
to a non-covered benefit." A more natural reading of
this general exclusion is that it would apply to services
and supplies that were contemporaneously needed
for a non-covered service.

As much as this language might puzzle the average
patient, it turns out that it also created confusion for
at least two of Kenseth's doctors. On November 1, 2005,
Kenseth saw Dr. Christiansen, who referred Kenseth to
a surgeon, Dr. Huepenbecker. Dr. Christiansen's notes
regarding this visit indicate that she discussed three
possible treatments with Kenseth: (1) dilation and
steroid injections at the point of the stricture, a treat-
ment that previously had provided temporary relief;
(2) surgical resection of the pouch or the banding, which
Dr. Christiansen noted "would require being paid out of
pocket"; or (3) new gastric bariatric surgery. R. 21, at 16.
Dr. Christiansen noted that she suggested to Kenseth that
she see Dr. Huepenbecker "so that she can see whether
or not this really does need to be considered bariatric
surgery or simply that it needs to be repaired and if it will
get paid for. At this point she is feeling so miserable
she may decide to just pay for it herself however." R. 21,
at 16. These notes indicate some confusion regarding

whether certain procedures would be considered non-covered because they were bariatric surgery as opposed to a repair that might be covered. Dr. Huepenbecker, for his part, averred that Kenseth's original surgery was a common procedure at the time she had it, that most insurers at that time paid for it and that he believed Dean routinely covered this surgery for his patients in the late 1980s, around the time that Kenseth had her surgery. He noted that the repair was meant to correct a complication of the earlier surgery and that Kenseth was not obese at the time of the corrective surgery. He believed that Dean would cover the corrective procedure:

> It is my understanding that Dean Health Plan would provide coverage for a complication to a prior VBG surgery as I believe Dean covered the VBG in the 1980's and 1990's and therefore should cover complications in a prospective manner.

R. 34-2. Thus, one doctor was uncertain whether the procedure would be covered by Dean's plan, and a Dean-affiliated doctor affirmatively believed that it would be.

We also determined in our first opinion that the Certificate contained other significant ambiguities. Namely, the Certificate does not identify a means by which a participant or beneficiary may obtain an authoritative determination as to whether a particular medical service will be covered by a plan. *Kenseth I*, 610 F.3d at 476. Yet Dean conceded that there was a means by which participants could obtain such a determination, a means that Dean has yet to clarify. Instead, the Certificate directed the reader to contact Dean's customer service line if

she was "unsure if a service will be covered." That directive, though, was not accompanied by a warning that the caller could not rely on the answer given. *Kenseth I*, 610 F.3d at 476-77.

Dean does not seriously dispute our earlier conclusion that the policy was ambiguous. As we noted above, a plan fiduciary could comply with its duty to provide material information to participants and its duty not to mislead participants by providing clearly-written plan documents and appropriately training staff to field inquiries regarding the plan terms. On remand, the district court must next assess the issue of customer service training. Dean concedes it did not train customer service representatives to warn callers that they could not rely on the advice given when they called to inquire whether a procedure would be covered. Inviting plan participants to call customer service with their questions regarding coverage without any warning that they could not rely on the answers given might have the effect of lulling callers into believing that they could and should rely on the advice of Dean's customer service representatives regarding the interpretation of Dean's Certificate. *Kenseth I*, 610 F.3d at 477-79. The district court must consider whether such a practice is consistent with a fiduciary's obligation to carry out its duties with respect to the plan:

"solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; . . . [and] (B) with the care, skill, prudence,

and diligence under the circumstances then pre-
vailing that a prudent man acting in a like
capacity and familiar with such matters would use
in the conduct of an enterprise of a like character
and with like aims. . . ." 29 U.S.C. § 1104(a)(1).

*Kenseth I*, 610 F.3d at 465-66.

That leads us to Dean's new argument on breach
of fiduciary duty. On appeal, Dean focuses its opposi-
tion to summary judgment for this issue on Kenseth's
behavior. In doing so, to a certain extent, Dean conflates
the issue of breach with the issue of causation. For ex-
ample, Dean complains that Kenseth did not read the
Certificate and so did not see the warning that no oral
statements of any person shall modify, increase or
reduce benefits. Dean notes that Kenseth admitted at
her deposition that, had she read this statement, she
would have understood it. We addressed both of these
facts in our first opinion and see no reason to alter our
earlier analysis. No doubt Kenseth would have under-
stood the general proposition that oral statements could
not increase benefits. But she was not calling Dean to
ask for increased benefits or a modification of the plan;
she was calling to ask what benefits the Certificate pro-
vided with respect to her upcoming surgery. *Kenseth I*,
610 F.3d at 479. This is exactly what the Certificate
invited her to do: call customer service with questions
regarding the meaning of the Certificate.

Dean also complains that Dr. Christiansen discussed
with Kenseth that surgery would be an out-of-pocket
expense because it would be considered a complication

of a prior bariatric surgery. Construing the facts in favor of Dean, Dr. Christiansen discussed with Kenseth that "surgical resection of the pouch and/or the banding" would be out-of-pocket. Dr. Christiansen also noted that she was not an expert in gastric bariatric surgery and therefore wanted Kenseth to visit Dr. Huepenbecker to determine "whether or not this really does need to be considered bariatric surgery or simply that it needs to be repaired and if it will get paid for." R. 21. As we noted above, neither Dr. Christiansen nor Dr. Huepenbecker could definitively advise Kenseth on whether Dean would cover the procedure. The plan did not clearly exclude it, and Dean advised participants with questions regarding coverage to call customer service, which is exactly what Kenseth did. That Dr. Christiansen was of the opinion that one procedure would be out-of-pocket and that others might be covered increased the need for Kenseth to clarify with Dean how the Certificate applied to her circumstances.

Finally, Dean asserts that Kenseth did not provide complete and accurate information to the Dean customer service representative when she called with her coverage question. In particular, she did not mention that the proposed surgery was intended to address complications from the gastric banding surgery she had undergone eighteen years earlier to treat morbid obesity. Kenseth testified that she did not specifically decide to withhold that information, and could not recall why she did not mention it, other than to comment that she was calling from work and had a limited amount of time. R. 21, at 30-31. Kenseth instead described the surgery

using her best recollection of her surgeon's explanation. Notably, the customer service representative did not ask Kenseth if the surgery was related to a prior bariatric surgery.

Of course, in general, the plan administrator is in a far better position to know what information is relevant to the plan administrator's own assessment of a coverage issue than is a plan participant. In this instance, Kenseth told the customer service representative that she was scheduled to have "a reconstruction of a Roux-en-Y stenosis." Detmer, the representative, asked "what that had to deal with" and Kenseth replied that "it had to deal with the bottom of the esophagus because of all the acid reflux I was having." R. 21, at 30. In any case, though, this fact is not material to the breach of fiduciary duty that we set forth in our earlier opinion:

> The facts support a finding that Dean breached its fiduciary duty to Kenseth by providing her with a summary of her insurance benefits that was less than clear as to coverage for her surgery, by inviting her to call its customer service representative with questions about coverage but failing to inform her that whatever the customer service representative told her did not bind Dean, and by failing to advise her what alternative channel she could pursue in order to obtain a definitive determination of coverage in advance of her surgery.

*Kenseth I*, 610 F.3d at 456. Kenseth's failure to volunteer additional information regarding the origin of her illness is not material to any of Dean's actions or omissions in

breaching its fiduciary duty as we defined that possible breach in our first opinion. Whether Dean's breach of duty *caused* Kenseth's damages is a different question, but Kenseth's actions (or omissions) have nothing to do with whether Dean breached its duty as a fiduciary. As of yet, Dean has offered no rebuttal to the facts regarding the ambiguity of the policy, the invitation to call customer service with coverage questions, the absence of any warning that the advice given by customer service did not bind Dean, and the failure to advise participants of any other means to obtain a definitive assessment of coverage prior to incurring costs. We leave it to the district court on remand to determine whether Dean breached its fiduciary duty. If so, the court must determine whether that breach (as opposed to any other cause) harmed Kenseth, and then fashion appropriate equitable relief to remedy the harm.

**E.**

In addition to seeking surcharge, Kenseth sought injunctions requiring Dean to amend the Certificate, cure ambiguities in the summary plan description, train customer service representatives, and implement different procedures.[7] The district court noted that, although

---

[7] Kenseth also asked the court to enjoin subsidiary or parent corporations of Dean from collecting fees from her. In general, a court may not enter orders against nonparties. "'It is a

(continued…)

these are clearly forms of equitable relief available under Section 1132(a)(3), Kenseth had not received insurance from Dean since the end of 2006, when her employer chose a new plan. The court further found that it was merely speculative that Kenseth would be a participant in Dean's plan in the future. The court thus concluded that, because Kenseth could not benefit from the prospective injunctions she sought, she lacked standing to pursue this relief.

To demonstrate standing:

> a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as

---

[7] (...continued)

principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.'" *Taylor v. Sturgell*, 553 U.S. 880, 884 (2008) (quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940)). *See also National Spiritual Assembly of Bahá'ís of U.S. under Hereditary Guardianship, Inc. v. National Spiritual Assembly of Bahá'ís of U.S., Inc.*, 628 F.3d 837, 847 (7th Cir. 2010) (noting the extent to which an injunction may be enforced against nonparties); Fed. R. Civ. P. 65(d) (codifying the general principle that courts may only bind parties and noting the exceptions to this rule). Kenseth makes no argument that any of the exceptions to the general rule apply here and so the court may not enjoin these nonparties.

> opposed to merely speculative, that the injury will
> be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167, 180-81 (2000). Moreover, a plaintiff must
demonstrate standing for each form of relief sought. A
plaintiff may have standing to pursue damages but not
injunctive relief, for example, depending on the circum-
stances. *Friends of the Earth*, 528 U.S. at 185. Finally, the
plaintiff's personal stake in the outcome of the litigation
must continue throughout the course of the litigation.
*Arizonans for Official English v. Arizona*, 520 U.S. 43, 67
(1997) (plaintiff's resignation from state employment
mooted her First Amendment claim because the chal-
lenged statute no longer governed her speech and she
thus lacked a still-vital claim for prospective relief).
Certainly, at the time that Kenseth filed the action, she
had standing to pursue prospective injunctive relief.
However, her employer's change in insurance plans
mooted that part of her case. The district court rejected
Kenseth's claim that she maintained standing because
she might again become a participant in Dean's plan,
characterizing the claim as merely speculative. *See
Sierakowski v. Ryan*, 223 F.3d 440, 443 (7th Cir. 2000) (in
order to invoke Article III jurisdiction, a plaintiff in
search of prospective equitable relief must show a sig-
nificant likelihood and immediacy of sustaining some
direct injury).

Apparently, after the court entered judgment, Kenseth
again became a participant in Dean's health plan when
her husband signed up for the plan through his new

employer. We say "apparently" because we denied Kenseth's motion to supplement the record with this information and so this fact is not part of the record on appeal. Although the district court was correct at the time it entered judgment that Kenseth was not entitled to prospective injunctive relief at that time, we leave it to the district court on remand to determine in the first instance if Kenseth's new participation in Dean's plan revives her claims for prospective injunctive relief. *See Young v. Lane*, 922 F.2d 370, 373-74 (7th Cir. 1991) (although prisoners' First Amendment claims seeking injunctive relief against prison officials became moot when they were transferred to other institutions, they were entitled on remand to an opportunity to demonstrate that their claims for prospective injunctive relief remained live because they were likely to be re-transferred to the offending prison).

### F.

We turn finally to a few loose ends. First, Dean belatedly raises an argument that Kenseth was not a "participant" as that term is defined in the statute and therefore is not entitled to bring a claim under section 1132(a)(3). Dean predicates this argument on the idea that Kenseth was not a participant in any Dean plan between January 1, 2007 and February 15, 2011, when the district court entered judgment in favor of Dean. Dean could have raised this issue in the first round of proceedings in the district court and in the first appeal but did not do so. Dean may not now use the opportunity created by the

remand to raise this issue for the first time. *Mirfasihi v. Fleet Mortgage Corp.* 551 F.3d 682, 685 (7th Cir. 2008) (issue mentioned in complaint but argued for first time only after remand is too late). *United States v. Schroeder*, 536 F.3d 746, 751 (7th Cir. 2008) (any issue that could have been but was not raised on appeal is waived and thus not remanded); *United States v. Husband*, 312 F.3d 247, 250-51 (7th Cir. 2002) (same); *United States v. Morris*, 259 F.3d 894, 898 (7th Cir. 2001) (parties cannot use the accident of remand as an opportunity to reopen waived issues). In any event, Kenseth *was* a participant at the time she suffered the injury for which she seeks relief, and so we need not address this waived issue further.

Second, the district court declined to award attorneys' fees to Kenseth under section 1132(g)(1), which allows a court, in its discretion, to award reasonable attorneys' fees and costs to either party. *See* 29 U.S.C. § 1132(g)(1). At the time the court decided this issue, Kenseth had obtained only limited success in the litigation. At this point, however, she has won partial summary judgment on her breach of fiduciary duty claim and may yet obtain significant equitable relief on that claim on remand. The court should therefore again consider whether to award fees to Kenseth as a party with "some degree of success on the merits." *Hardt v. Reliance Standard Life Ins. Co.*, 130 S. Ct. 2149, 2158 (2010); *Raybourne v. Cigna Life Ins. Co. of New York*, 700 F.3d 1076, 1088-91 (7th Cir. 2012) (ERISA litigant who had one claim and one theory throughout the litigation, a claim on which he ultimately and com-

pletely prevailed, may be entitled to fees for the entirety of the litigation even though he lost a few skirmishes along the way).

### III.

*Cigna* substantially changes our understanding of the equitable relief available under section 1132(a)(3). Kenseth has argued for make-whole relief in the form of monetary compensation for a breach of fiduciary duty from the start of this litigation. We now know that, in appropriate circumstances, that relief is available under section 1132(a)(3). *See Cigna*, 131 S. Ct. at 1881-82. We remand so that the district court may address the question of whether Dean breached its fiduciary duty and whether that breach was the cause of any harm that Kenseth suffered. Finally, we leave it to the district court to determine in the first instance what form any equitable relief should take in light of the particular circumstances presented here.

VACATED AND REMANDED.

MANION, *Circuit Judge*, concurring.    After one of
Deborah Kenseth's doctors recommended that she
undergo a Roux-en-Y gastric bypass procedure to
address complications from an earlier gastric banding
surgery, Kenseth called Dean to ask whether the sur-
gery was covered by her insurance policy. The Dean
representative asked Kenseth the nature of the surgery
and Kenseth replied that the procedure was related to
the bottom of her esophagus and acid reflux; Kenseth
never mentioned the connection to her earlier gastric
banding surgery. *Kenseth I*, 610 F.3d at 459-60. After
speaking with her supervisor, the Dean representative
informed Kenseth that the surgery would be covered,
subject to a $300 co-pay. Following her surgery, Dean
learned of the connection between the Roux-en-Y gastric
bypass procedure and the earlier gastric banding surgery
and denied Kenseth coverage. In *Kenseth I*, this court
held that Dean was not entitled to summary judgment on
Kenseth's breach of fiduciary duty claim where: Kenseth
had specifically called to determine whether the surgery
was covered; Dean had informed her the surgery would
be covered (subject to a $300 co-pay), but later denied
coverage; the Certificate of Insurance was ambiguous
on whether there was coverage for the surgical pro-
cedure; the Certificate failed to identify a means by
which a participant could obtain an authoritative de-
termination on a coverage question; and the Certificate
invited participants to call customer service with
coverage questions but did not warn them that they
could not rely on any advice they received. *Kenseth I*, 610
F.3d at 469-78. On the breach of fiduciary duty claim,

we vacated the grant of summary judgment to Dean and "remand[ed] for a determination as to whether Kenseth is seeking any form of equitable relief that is authorized by 29 U.S.C. § 1132(a)(3) and, if so, for further proceedings on that claim as are consistent with this opinion." *Kenseth I*, 610 F.3d at 483.

On remand, the district court again granted Dean summary judgment, this time concluding, among other things, that Kenseth had not shown the availability of "appropriate equitable relief" for Dean's purported breach of fiduciary duty. In its decision, the district court acknowledged that it was "not writing on a blank slate" and it relied in great part on the Supreme Court's decision in *Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993), and this court's holding in *Kenseth I*, both of which called into question the availability of an equitable remedy. District Court Opinion 5-7; 9-15.

However, after the district court issued its decision, the Supreme Court's decision in *Cigna Corp. v. Amara*, 131 S. Ct. 1866 (2011), came down. In *Cigna*, the district court had held that Cigna had breached its fiduciary duties to the plaintiffs by changing the nature of its pension plan for employees, while misleading the employees and giving them "significantly incomplete" notice of the changes. *Id.* at 1872-73. This left a large number of employees worse off than under the old pension plan. Among other things, Cigna transferred to the new pension plan amounts that did not "represen[t] the full value of the benefits" that employees had earned under the old pension plan. *Id.* On appeal, the Supreme Court

considered the propriety of the district court's remedy. It held that reformation and then enforcement of the reformed plan was not authorized by § 502(a)(1)(B). But it also noted that the employees of Cigna Corporation might be entitled to recover a monetary remedy of surcharge as "appropriate equitable relief" under § 502(a)(3), for the defendant's breach of fiduciary duties. *Id.* at 1875-80.

In vacating the district court's opinion and remanding the case to the district court for further proceedings, the court in this case relies extensively on *Cigna*. Opinion at 16-24; 30-32. I agree that *Cigna* requires reversal and that *Cigna* makes clear that a monetary payment may qualify as "an appropriate equitable remedy" when a fiduciary is involved. *Cigna*, 131 S. Ct. at 1880 ("But the fact that this relief takes the form of a money payment does not remove it from the category of traditionally equitable relief."). I also agree that we should leave it to the district court in this case to fashion appropriate relief in the first instance. Opinion at 32. I disagree, though, that "if Kenseth is able to demonstrate a breach of fiduciary duty as we set forth in our first opinion, and if she can show that the breach caused her damages, she may seek an appropriate equitable remedy including make-whole relief in the form of money damages." Opinion at 31-32.

*Cigna* did not hold that money damages are an appropriate equitable remedy. Rather, *Cigna* concluded that the fact that "relief takes the form of a money payment does not remove it from the category of traditionally

equitable relief." *Id.* 131 S. Ct. at 1880. The Supreme Court then illustrated this point, explaining: "[e]quity courts possessed the power to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment. . . . [T]his kind of monetary remedy against a trustee, sometimes called a 'surcharge,' was 'exclusively equitable.'" *Id.* That language from *Cigna*, though, does not support the conclusion that make-whole relief in the form of money damages is recoverable as "appropriate equitable relief" under § 502(a)(3). *See McCravy v. Metropolitan Life Ins. Co.*, 690 F.3d 176, 181 (4th Cir. 2012) ("In sum, the portion of [*Cigna v.*] *Amara* in which the Supreme Court addressed [§ 502(a)(3)] stands for the proposition that remedies traditionally available in courts of equity, expressly including estoppel and surcharge, are indeed available to plaintiffs suing fiduciaries.").

The court in this case quotes the surcharge language from *Cigna*, and also relies on *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 450 (5th Cir. 2013), and *McCravy*, 690 F.3d at 181, both of which also discuss the surcharge remedy. The court's discussion today might lead some to wrongly believe that a plaintiff can recover monetary damages under § 502(a)(3) by calling the relief sought a surcharge. That was not *Cigna*'s holding. Rather, *Cigna* noted that surcharge is one type of equitable remedy which may be appropriate in certain situations, including, *possibly*, the facts of that case, where the breach of trust affected the amount of money contributed to the beneficiaries' retirement accounts initially, and then

paid out eventually. And "surcharge" is not simply the moniker given to any monetary payment for an equitable harm—if it were, then there would be no need for other equitable remedies, such as restitution, equitable estoppel, or a constructive trust.

Moreover, while *Cigna* explained that a surcharge *might* be an appropriate remedy, it did not go so far as to say it *was* an appropriate remedy. *See Cigna*, 131 S. Ct. at 1880. ("We cannot know with certainty which remedy the District Court understood itself to be imposing, nor whether the District Court *will find it appropriate to exercise its discretion under § 502(a)(3) to impose that remedy on remand*. We need not decide which remedies are appropriate on the facts of this case. . . .") (emphasis added). The *Cigna* Court also made clear that its "decision rests in important part upon the circumstances present here, . . . ." 131 S. Ct. at 1871. Thus, that *Cigna* concluded that a surcharge might be an appropriate remedy given the facts of that case,[1] does not mean that it *is* an appropriate

---

[1] A surcharge might have made sense in *Cigna* because the breach of trust involved the amount of money contributed to beneficiaries' retirement accounts initially, and then paid out eventually. That scenario mirrored the common law trust situation where the surcharge remedy was utilized, as demonstrated by the supporting citations in *Cigna*. For instance, in discussing the surcharge remedy in *Cigna*, the Supreme Court cited the Restatement (Third of Trusts) § 95. That Section is entitled, "*Surcharge liability for breach of trust*" and provides: "If a breach of trust causes a loss, including any failure to

(continued...)

---

[1] (...continued)

realize income, capital gain, or appreciation that would have resulted from proper administration of the trust, the trustee is liable for the amount necessary to compensate fully for the breach. *See* § 100." Restatement (Third of Trusts) § 100, cited by § 95, similarly provides: "If a breach of trust causes a loss, including any failure to realize income, capital gain, or appreciation that would have resulted from proper administration, the beneficiaries are entitled to restitution and may have the trustee surcharged for the amount necessary to compensate fully for the consequences of the breach." The Supreme Court also relied on G. Bogert & G. Bogert, Trusts & Trustees § 862 (rev. 2d ed. 1995), which explained that:

> For a breach of trust the trustee may be directed by the court to pay damages to the beneficiary out of the trustee's own funds, either in a suit brought for that purpose or on an accounting where the trustee is surcharged beyond the amount of his admitted liability.

> Thus the making of unauthorized payments to other beneficiaries, the conversion of the trust property, negligence in recording instruments affecting the trust property, or in obtaining security, or in collecting the trust property, or in the retention of property until it is worthless, wrongful sale of trust property, or negligence or misconduct in the making or retaining of investments, may give rise to a right in favor of beneficiaries to recover money damages from the trustee.

The court also cited *Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 464 (1939), which held that a court had the power to require the trustee to take over from the trust the

(continued...)

remedy in this, or other, cases. *See McCravy*, 690 F.3d at 181-82 ("Whether McCravy's breach of fiduciary duty claim will ultimately succeed and whether surcharge is an appropriate remedy under § 502(a)(3) in the circumstances of this case are questions appropriately resolved in the first instance before the district court."); *Gearlds v. Entergy Services, Inc.*, 709 F.3d 448, 452 (5th Cir. 2013) ("We leave to the district court the determination whether Gearlds's breach of fiduciary duty claim may prevail on the merits and whether the circumstances of the case warrant the relief of surcharge."). And it does not mean that money damages are available under § 502(a)(3).

In the end, it will be up to the district court to determine whether an equitable remedy is appropriate, and if so, which one, following a trial.[2] And I do agree

----

[1] (...continued)

investments the trustee had improperly made and to restore to the trust the amount expended for them, and to surcharge the trustee for losses incurred. *See generally* G. Bogert & G. Bogert, Trusts & Trustees § 862 (rev.2d ed.1995).

[2] Because § 502(a)(3) authorizes only "equitable relief" there is no right to a jury trial. *McDougall v. Pioneer Ranch Ltd. Partnership*, 494 F.3d 571, 576 (7th Cir. 2007); *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 79 n.10 (3d Cir. 2012); *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 393 (3d Cir. 1988). However, if both Kenseth and Dean consent to a jury trial and the district court agrees, the case could be tried before a jury. Rule 39(c). But even then, whether a jury could determine what is "appropriate

(continued...)

with the court that a trial is required on the breach of fiduciary duty claim and that the district court erred in granting Dean summary judgment.[3]

Finally, I believe it is important to stress again, that, like *Cigna*, this "decision rests in important part upon the circumstances present here, . . . ." 131 S. Ct. at 1871. As noted above, those circumstances are that Kenseth called and asked Dean whether the surgery would be covered by her insurance policy and the Dean representative, even after checking with her supervisor, wrongly informed Kenseth that the surgery was covered (subject to a $300 co-pay), but Dean later denied coverage; and the Certificate of Insurance was ambiguous on whether there was coverage for the surgical procedure. The Cer-

---

[2] (...continued)
equitable relief" in this case is questionable. *See Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 501 (7th Cir. 2000).

[3] I agree that we review the district court's decision on summary judgment *de novo* because there is a factual dispute on the breach of fiduciary duty claim. Had the only issue been the appropriateness of equitable relief, the clearly-erroneous standard of review would apply. *See Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC*, 668 F.3d 873, 877 (7th Cir. 2011) ("We ordinarily review a district court's grant of summary judgment in an ERISA case *de novo*. *Pioneer Ranch*, 494 F.3d at 575. When, however, the only issue before the district court is the characterization of undisputed subsidiary facts, and where a party does not have the right to a jury trial, the clearly-erroneous standard of review applies. *Id*.").

tificate also failed "to identify a means by which a participant may obtain an authoritative determination on a coverage question," and "invit[ed] participants to call customer service with coverage questions but not warning them that they could not rely on any advice they received." Opinion at 30. The holding in *Kenseth* cannot be separated from these facts and it is in this context that there is a fiduciary "duty to disclose material information" to plan participants, and "also an affirmative obligation to communicate material facts affecting the interests of plan participants." Opinion at 6-7. Whether there was a breach of fiduciary duty which harmed Kenseth and whether there is an appropriate equitable remedy available to her remain questions for remand.

For these reasons, I concur in judgment.